**IN THE COURT OF APPEALS OF IOWA**

No. 15-0319
Filed June 10, 2015

**IN THE INTEREST OF I.D.,**
**Minor Child,**

**S.P., Father,**
**Appellant.**

_____

Appeal from the Iowa District Court for Black Hawk County, Daniel L. Block, Associate Juvenile Judge.

A father appeals the dispositional orders denying his request to begin immediate visitation with his child. **AFFIRMED.**

Andrew C. Abbott of Abbott Law Office, P.C., Waterloo, for appellant father.

Thomas J. Miller, Attorney General, Bruce Kempkes, Assistant Attorney General, Thomas J. Ferguson, County Attorney, and Kathleen A. Hahn, Assistant County Attorney, for appellee State.

Melissa Anderson Seeber of the Waterloo Juvenile Public Defender, Waterloo, attorney and guardian ad litem for minor child.

Considered by Danilson, C.J., and Vaitheswaran and Doyle, JJ.

**DOYLE, J.**

In this child-in-need-of-assistance (CINA) proceeding, S.P., the biological father of I.D., appeals from the dispositional order and the dispositional review order continuing I.D.'s custody with the Iowa Department of Human Services (Department) and denying his request for immediate visitation with I.D. The State asserts the father failed to preserve the issue for our review but, in any event, his claim fails based upon the child's best interests. Though this is a close case, we affirm.

### I. Background Facts and Proceedings.

S.P. is the father, and R.M. is the mother of I.D., born in 2006. The mother is married to J.M., I.D.'s stepfather. I.D. has a younger half-sibling, the mother and stepfather's child, not at issue here. The children live with the mother.

The children came to the attention of the Department in October 2013, after it was reported the stepfather assaulted the mother while she was holding her youngest child, in front of I.D. Specifically:

> [The stepfather] hit and choked [the mother], causing injuries. [The mother] yelled for [I.D.] to go to the neighbor's home for help but [the stepfather] refused to allow [I.D.] to leave the home. [The stepfather] threatened to harm the children. He threatened the family with a knife. [The stepfather] was [arrested and] charged with child endangerment, domestic abuse, and harassment.

The stepfather ultimately served time in prison for his acts. I.D. reported witnessing other incidents of domestic violence between the mother and stepfather.

The father was contacted regarding the incident, and he told the Department's case worker that he had had sporadic contact with I.D. due to his work schedule "and his own choices," and he had last seen I.D. in approximately April 2013. He could not "provide any information regarding the care [I.D.] receive[d]." He later stated he had not seen the child "until her paternity was established when she was [six]-months old," and he saw the child occasionally with the mother thereafter. He acknowledged he had not maintained a relationship with the child; nevertheless, the father expressed a desire to become involved in the child's "life through this court process," though he did "not want to push the relationship on [the child]."

In January 2014, the child was adjudicated CINA, and she subsequently began seeing a therapist and participating in play therapy "to address [her] issues [of being bullied] at school as well as her having to testify in criminal court against [the stepfather]." The father told the case worker he was "willing to follow the guidance of the [child's] therapist" in establishing a relationship with the child. The Department's February 2014 report to the court prior to the dispositional hearing reported the father had indicated again

> that he would like to have more regular contact with [the child] but was willing to not push the issue (as he legally could) at this time and was willing to work with [the Department] and the [child's therapist] to assess what the best plan for contact would be, based on what is best for [the child]. It was discussed that the [case] worker ha[d] a call into the play therapist . . . to get a recommendation from the therapist about the best way to proceed with contact. It was discussed that it might include his first contacts [with the child] being in a therapeutic setting (therapy) but also could include being supervised by the [service] provider until a relationship [was] more established. [The father] was in agreement to [proceed] in whatever way the therapist and [the Department] recommended.

A family interaction plan was to be developed in the future for contact between the father and the child after the therapist was consulted and could make a recommendation.

In March 2014, the court filed its dispositional order directing I.D. to continue play therapy. The court noted the father had "filed a motion for concurrent jurisdiction and [was] anxious to begin visitation with [the child]," but the mother objected to the father's motion. The court continued the CINA adjudication and the child's placement with the mother under the supervision of the Department, with visitation at the Department's discretion. It did not rule on the father's motion for concurrent jurisdiction. The court set a review hearing for June 2014.

Just prior to the June review hearing, the Department filed its report to the court. The report set forth information regarding the progress of the mother, stepfather, and the children. Concerning the father, it stated the father "agree[d] to wait to see [the child] until her therapist recommend[ed] it. He does not want to cause her stress but has a strong desire to be in her life." The report then stated: "At this time this worker has not heard back from [the child's] therapist with an update regarding visits" and that the worker would "continue to contact [the therapist] in hopes of having an answer at court." Following the review hearing, the juvenile court filed its review order directing the father to "work with the child's play therapist in determining when/how visitation should commence," and it set another review hearing for October 2014.

Shortly thereafter, the child's play therapist provided a letter to the Department discussing the child's progress in therapy. The letter, dated June 20,

2014, stated the therapist had been meeting with the child weekly for individual therapy sessions since January 2014. Concerning the father, it stated:

> [The child] appears to be much more comfortable discussing topics unrelated to her family. She continues to deny she knows [the father] and refers to [the stepfather] as her dad. Although [the child] continued to be very guarded, [the child] has been able to express her feelings related to family dynamics. Specifically, [the child] has expressed a desire to continue having contact [with the stepfather].

The therapist recommended the child continue in therapy, but the therapist did not recommend the father attend the child's therapy sessions "until further therapeutic progress [was] made regarding their relationship."

In August 2014, the father met with the case worker and the child's therapist, and they developed a plan to assist the father "in becoming more involved in [the child's] life." The child's therapist wanted to expose the child to the father "slowly and during [the child's therapy] sessions." The father "agreed to write weekly letters to [the child]" and "send pictures of himself and his home to assist [the child] in becoming more aware of him." A phone meeting was scheduled a month later. However, the father did not follow through with the plan nor call in for the meeting.

Following the October 2014 review hearing, the juvenile court entered its order essentially maintaining the status quo. Concerning the father, the court stated the father had "acknowledge[d] that he need[ed] to initiate letters to [the child]." The court found the father had "not followed through with [the] plan to reinitiate himself back into [the child's] life," and it denied the father's request for concurrent jurisdiction, finding "no meaningful relationship exist[ed] between the child and [the father]." Another review hearing was set for February 2015.

Prior to the February 2015 review hearing, the Department filed another report to the court. The report indicated that the stepfather had been released from prison in January 2015, and the child's therapist recommended the stepfather attend one of the child's therapy sessions thereafter, which the stepfather did. The therapist reported the session went well and that the child and the stepfather "appeared to enjoy this time together." Concerning the father, the report stated that since the last court hearing in October, the father had sent additional letters and pictures to the child's therapist, and the therapist "shared the pictures and a letter with [the child] on one occasion. [The child] looked down and did not want to talk about him." The therapist reported she would "continue to work on finding the right time to address [the father] with [the child]," but she did "not want to push" the child, fearing the child "could shut down completely."

On February 5, 2015, the juvenile court held its review hearing. There, the father requested immediate visitation with the child. The father explained he had been willing to wait, but a year had gone by since the child started therapy with no progress towards reuniting him with the child, and he had not seen the child for eight to ten months despite his attempts to have contact with the child. He noted that since the last hearing, he had sent emails and letters and pictures to the child's therapist, but there had been no progress; yet, although the child had witnessed horrific domestic abuse between the stepfather and the mother, the stepfather had been allowed to have a therapy session with the child. The father stated he was trying to be patient, but he wanted to have a relationship with the child, and he requested the court order visitation.

The child's therapist was present for the hearing, and she explained:

I bring [the father] up and his emails every time they're sent and read them aloud to [the child]. [The child], immediately her demeanor changes when we bring up the topic of [the father]. I'm not against bringing up that subject. I think it's something that needs to be processed through. But as a therapist, I am not going to force any of my clients to talk about something they're not emotionally ready to talk about. And when we talk about the situation, we also talk about other family dynamics . . . . [R]ight now, [the child] has a hard time even identifying how she feels about seeing him. The most I've gotten from her is to say that she feels in between good and bad when she thinks about writing a response to [the father's] emails.

So take it or leave it, that's a little bit of therapeutic progress from a child who immediately had no eye contact, shrugged her shoulders and kept saying I don't know every time I asked her a question about [the father].

And, you know, I would like to be able to include him in therapeutic sessions at some point. I don't think we're there yet. I'm not against that. I am just looking out for the best interest of my client. I'm not going to push her to discuss something that she's not ready completely to discuss even though I think we're making very, very tiny steps in progressions.

The child's guardian ad litem recommended the court follow the therapist's recommendations, "trust[ing] the therapist to know what is the appropriate topic that [the child] needs to be addressing at any given time." She also requested patience, clarifying there was no punitive reason for the delay. Rather, she was really "look[ing] at the long-term best interest of the whole family."

On the record, the court denied the father's request for visitation, stating to the father:

I understand your frustration. I wish I had an easy answer for you. But I am going to obviously take things at the child's pace. You've heard me say that before, I think. I truly believe . . . in my [eighteen] years of experience as a juvenile court judge and [twenty] some years in juvenile court, if I just say [to the child], "Hey, guess what? [Y]ou're going to start seeing your dad." It's going to be detrimental to both of you and to your long-term goal of having a relationship with [the child].

However, the court stated it "fully expect[ed] that this needs to work towards the relationship—you know, visitation, I guess, in a therapeutic setting and ultimate visitation." The court advised the father to continue writing letters to the child and "keep persevering."

Thereafter, the court filed its order continuing the CINA proceedings and maintaining the status quo. The court again denied the father's visitation request, finding the father had "not actively followed through with a plan to reinitiate himself back into [the child's] life through letters and emails" and noting the child's therapist did not support starting visitation at that time. However, it granted the father's prior request for concurrent jurisdiction for the purposes of establishing custody, visitation, and placement of the child.

The father now appeals.

## II. *Discussion*.

On appeal, the father asserts the juvenile court erred in denying his request for visitation, as well as finding visitation should occur at the direction of the child's therapist. He points out he has not had contact with the child for more than a year and believes the therapist "has failed to address the father/child relationship." The State contends error was not preserved on this issue, but it alternatively argues the juvenile court did not err in not awarding the father visitation or in allowing the child's therapist to dictate when and how visitation between the father and the child should occur. We address the arguments in turn.

### A. *Error Preservation.*

The State first asserts the father "never addressed any argument the therapist 'failed to address the father/child relationship [in a timely manner].'" It also maintains, among other things, that the father "never acknowledges his own failings" and "makes no challenge to the juvenile court finding . . . that he 'has not actively followed through with [the] plan [for reunification].'"

It is true that parties to a child welfare hearing have an obligation to preserve error for appeal, even if the alleged error impacts their constitutional rights. *See In re K.C.*, 660 N.W.2d 29, 38 (Iowa 2003) (finding parents waived due process challenge because they "did not lodge an objection alerting the juvenile court to their complaints"). However, it is clear the father raised the visitation issue at the February 2015 review hearing, as well as the prior review hearings. Clearly challenging the timeliness of the therapist's progress and priorities with the child, the father pointed out at the most recent hearing that even the stepfather was able to have contact with the child via the therapist, while he had waited patiently for more than a year without anything. His wish to reunite with the child has been known by all parties since the commencement of the CINA proceedings; there was no surprise here.

Additionally, though the juvenile court made a finding in its February 2015 order the father was "not actively follow[ing] through," the information provided by the father's counsel and the child's therapist contradict that finding, as well as the court's own statements on the record to the father explaining its reasoning for not permitting immediate visitation. The court, relying upon the child's therapist,

believed immediate visitation was not in the child's best interests. There is no error preservation issue here.

### B. Visitation Request.

Turning to the father's argument, we find this to be a very close case. It appears the father has done essentially everything asked of him to re-engage with the child. He has been patient and willing to work with the child and the child's therapist to protect the child from any harm that might occur with him re-establishing a relationship with the child. It seems disingenuous to find the child may be harmed in having therapy sessions with the father, when therapy sessions with the stepfather were allowed. The court may certainly order visitation notwithstanding the therapist's recommendation.

That being said, our primary concern is always the best interests of the child. *K.N.*, 625 N.W.2d at 733; *see also* Iowa Code § 232.1 (2013). At the outset of the case, the father admitted he had not seen the child in approximately six months and did not have a relationship with the child. That is on the father. The child was in the mother's care, where she witnessed domestic abuse, and the father did not intervene or seek custody of the child.

At this point, the child's therapist opined the child's best interests were served in taking small steps toward reintegrating the father into the child's life. The juvenile court, in making its ruling, considered the child's therapist's recommendations. This is reasonable, given the absence of a real relationship between the child and the father before the CINA proceedings. Moreover, it is clear there is a plan, even if it is moving slower than the father would like, to develop a relationship between the father and child. The father's patience is

admirable, but his patience must continue so long as the child's best interests are served in progressing slowly toward involving the father in the child's life. Additionally, we note the court has now granted concurrent jurisdiction so that legal custody arrangements can be made. Because it is clear it is in the child's best interests to deny the father's visitation request at this time but continue the child's therapy with the goal of visitation between the father and the child, we affirm the juvenile court's dispositional order and the dispositional review order.

**AFFIRMED.**